**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

FILED
97 NOV 17 PM 2:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **PEMCO AEROPLEX, INC.**, | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV 91-N-1926-S |
| | ] | |
| **WIEN AIR ALASKA, INC., et al.**, | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED
NOV 17 1997

**MEMORANDUM OF OPINION**

### I. Background.

This action was initiated when plaintiff Pemco Aeroplex, Inc. ("Pemco") filed claims against the Wien parties and the GAC parties seeking a judicial determination of the title and ownership rights in three Boeing 737 aircraft that Pemco had repaired. The Wien parties and the GAC parties then filed cross-claims against one another. The primary issues between the Wien parties and the GAC parties related to the title and ownership of the three Boeing aircraft, known as the "Busy Bee," "Express One," and "Aloha" aircraft, respectively. The Wien parties' causes of action against the GAC parties were based upon an alleged oral contract between the Wien parties and the GAC parties whereby Wien allegedly was to purchase all of the stock of GAC. As contended by the Wien parties, the Busy Bee, Express One, and Aloha aircraft were to be purchased by GAC and leased back to Wien as part of the transaction. In their counter-claims and cross-claims filed on March 6, 1992, the Wien parties alleged:

116

5.  Wien Air Alaska, Inc. would show that in January of 1991 that the sole shareholder of GAC Germany, Mr. Stephan Grzimek entered into a contract with the Principal of Wien Air Alaska, Mr. Thor Tjontveit.

6.  The parties entered into an oral contract for Wien Air Alaska, Inc., Mr. Tjontveit, to purchase all of the stock of GAC Trans-Air Carrier Lease GmbH Flugzeugleasing. Mr. Grzimek was the sole shareholder of the GAC stock which he agreed to sell. After extensive negotiations, Mr. Grzimek entered into an agreement with Mr. Thor K Tjontveit that GAC would purchase three aircraft known as the "Busy Bee" aircraft, "Express One" and the "Aloha" aircraft.

7.  However, because Mr. Tjontveit and Wien Air Alaska, Inc. did not want to purchase and then sell the aircraft without having use of the aircraft because they had been negotiating for the purchase of said aircraft and intended to lease the aircraft to certain lessees for a profit and later fly the aircraft directly by Wien. They therefore insisted that Mr. Tjontveit and Wien have the right to lease the aircraft from GAC Germany, that Wien could sublease the aircraft, that Wien have a purchase option at the end of the leases for the aircraft and that the aircraft would remain registered and titled in Wien Air Alaska, Inc. <u>and that Mr. Tjontveit have the right to purchase all of the stock of GAC Germany.</u>

*Counter-Claims and Cross-Claims of the Wien parties*, at 10-11 (emphasis in original). Based upon these factual allegations, Wien asserted claims for common law fraud, fraudulent inducement, breach of contract, and conversion against the GAC parties. *See id.* at 15-21.

In May of 1992, the Wien parties and the GAC parties entered into a settlement agreement in an effort to resolve any and all claims that were asserted or could have been asserted between the parties at that time. On May 14, 1992, the court entered an order approving the settlement agreement. *See Order entered May 14, 1992*. In the May 1992 settlement agreement, the parties specifically provided:

2

>   This Agreement shall be null, void and of no effect unless the Court in the Alabama Action incorporates this Agreement into an order binding upon the parties therein and providing for the Court's retention of jurisdiction for the purpose of enforcing this Agreement as an Order of the Court; the parties hereby jointly request that the Court enter such Order.

*Settlement Agreement* ¶ 3.a.

As part of this settlement agreement, Wien and the GAC parties entered into mutual releases providing that

>   ... the parties hereby covenant and agree that all claims and controversies existing as of the date hereof between the GAC Parties, on the one hand, and the Wien Parties, on the other hand, are hereby settled and may not be relitigated between them in any forum whatsoever; and no one or more of the Wien Parties, on the one hand, and no one or more of the GAC Parties, on the other hand, shall commence or prosecute any action or proceeding, judicial, quasi-judicial or otherwise, against the other, regarding such claims or controversies.

*Settlement Agreement* ¶ 3.b.

Subsequent to the court's entry of its May 14, 1992, order, a dispute arose concerning the Wien parties' alleged failure to comply with the terms of the settlement agreement. The result of this dispute was the court's January 29, 1993, order in which the court permanently enjoined the Wien parties and the GAC parties from "initiating or prosecuting any further actions, claims or causes of actions based upon events or circumstances arising out of the matters that were the subject of the settlement agreement entered on May 14, 1992."[1] *Judgment /Order entered January 29, 1993,* at 1. The filing of

---

[1] At a hearing held the day before the judgment was entered, the court stated:

>   I am going to enjoin all of you from bringing any additional – first of all, from violating the terms of the settlement that was entered in May of last year and the order of this Court adopting and incorporating the terms of the settlement agreement; and second from bringing *any further actions based upon the relationship between [t]he GAC [p]arties and the Wien parties regarding the*

3

two lawsuits -- one in New York and one in Georgia -- by the Wien parties against the GAC parties (and others) prompted the present motion to show cause.

The matter is presently before the court on motion of the GAC parties to enforce the terms of the settlement agreement and to impose sanctions against Wien for their alleged violation of the terms of the injunction entered on January 29, 1993.

**II. Jurisdiction.**

As the GAC parties point out in their brief, the law is well settled that a district court can maintain jurisdiction over a case to enforce a settlement agreement and final judgment. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, ___, 114 S. Ct. 1673, 1677, 128 L. Ed. 2d 391 (1994); *DiMucci v. DiMucci*, 91 F.3d 845, 847 (7th Cir. 1996). A district court's power to retain jurisdiction to enforce a settlement agreement falls within its ancillary jurisdiction when, under *Kokkonen*, certain requirements are satisfied:

> [I]f the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal--either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a *breach of the agreement would be a violation of the order*, and ancillary jurisdiction to enforce the agreement would therefore exist.

*Kokkonen*, 511 U.S. at 381, 114 S. Ct. at 1677 (emphasis added).

---

> *transactions -- anything arising out of the transactions between the parties regarding the Busy Bee, the Express One, and the Lufthansa airplanes. Those are the airplanes that were involved in this settlement. And whatever else you've got going, God bless you.*

*Transcript of January 28, 1993, proceeding* at 336-37 (emphasis added).

In the May 14, 1992, order, the court, pursuant to the request of Wien and the GAC parties, ordered:

> The attached Settlement Agreement expressly is incorporated and made a part of this Order (but is not merged herein and shall survive as a separate contractual obligation of the parties) and the Wien Parties and the GAC Parties, who expressly consent to this jurisdiction, for purposes of enforcing this Order and/or the Settlement Agreement.

*Order entered May 14, 1992* ¶ 1. Accordingly, the court is possessed of the authority to enforce the parties' settlement agreement, together with the January 29, 1993, judgment order entered by the court. *See Kokkonen*, 511 U.S. at 380, 114 S. Ct. at 1676.

## III. Discussion.

### A. The New York Lawsuit.

The GAC parties argue that the Wien parties should be enjoined from prosecuting their lawsuit filed on February 27, 1997, against the GAC parties[2] in the United States District Court for the Southern District of New York. *See GAC Parties' Motion to Show Cause and Brief in Support* at 11-13. The GAC parties assert that the New York action, like the present action, is based upon the GAC parties' alleged failure to lease the three Boeing 737 aircraft and to sell the GAC stock to Wien. More specifically, Wien and Tjontveit allege in the New York complaint:

> GRZIMEK then induced WIEN AIR to purchase three Boeing 737 aircraft, for more than $20 million, in reliance on his representation that GAC would proceed with a certain sale and leaseback transaction with the Plaintiffs. Thus, in February 1991, GRZIMEK on his own behalf and on behalf of GAC, orally agreed with TJONTVEIT in the presence of BRANDT, that (i) GAC

---

[2] Wien and Tjontveit filed the New York lawsuit against defendants the GAC parties, Grzimek, Michael Ernestus, Gerald Brandt, and Hubertus Kestler. *See GAC Parties's Exhibit F*. The GAC parties do not allege that Wien should be enjoined from prosecuting their claims against the non-GAC defendants in the New York action.

would purchase the three Boeing 737 aircraft from WIEN AIR at an agreed upon price; (ii) TJONTVEIT would post DM 1.3 million (approximately $910,000) as "earnest money" with BRANDT's law firm, to be held in escrow, and would deliver into escrow the title to the aircraft; (iii) GAC would leaseback the aircraft to WIEN AIR, allowing for their use by WIEN AIR in its contemplated cargo business; (iv) WIEN AIR would have an option to purchase the aircraft at the end of the lease; and (v) TJONTVEIT would have the option to buy from GRZIMEK all of the stock in GAC for DM 5 million. Thereafter, in reliance on the foregoing representations and agreements (the "GAC Agreement"), TJONTVEIT executed his option to purchase the GAC stock.

*Original Complaint in New York lawsuit* ¶ 20. Based upon these factual allegations, Wien and Tjontveit asserted claims of fraud and breach of the "GAC Agreement" against the GAC parties and Grzimek. *See id.* at 8-9.

The record reflects that on July 9, 1997, counsel for the GAC parties sent a letter to Wien's New York counsel, requesting that Wien and Tjontveit dismiss the New York lawsuit based upon the settlement agreement; the May 14, 1992, order; the January 29, 1993, judgment; and the permanent injunction entered by the court. *See GAC Parties' Exhibit G.* Apparently, New York counsel for Wien did not respond to the July 9, 1997, letter. After the GAC parties filed the show cause motion now pending before the court, Wien dismissed the GAC parties from the New York lawsuit without prejudice. The GAC parties argue that the claims in the New York suit against them should be dismissed with prejudice, to protect them from any possible future claims. At the September 12, 1997, hearing, the Wien parties appeared to concede that the GAC parties are entitled to dismissal of that action with prejudice. *See Transcript of September 12, 1997, Hearing,* at 9. Accordingly, the GAC parties' motion will be granted to the extent it seeks an order

requiring Wien to dismiss the New York lawsuit, as to the claims against them, with prejudice.

### B. The Georgia Lawsuit.

The GAC parties also contend that the Wien parties should be enjoined from prosecuting a lawsuit against them, which Wien filed on May 29, 1997, in the Superior Court of Sumter County, Georgia. *See GAC Parties' Motion to Show Cause and Brief in Support* at 13-15. In the Georgia action, the Wien parties state claims against Grzimek, Gerald Brandt ("Brandt"), the Raven Aircraft Corporation, Flugservice Berlin ("FSB"), and Neue Flugservice Berlin, GmbH, and seek to impose an equitable lien and constructive trust on thirty-nine (39) Polish-manufactured aircraft allegedly owned by FSB and located in Sumter County, Georgia.[3] They have also requested that the Georgia court require a special accounting relating to any ownership interest the defendants have in such aircraft.

On June 24, 1997, the Wien parties amended their Georgia complaint to include claims against GAC and Hubertus Kestler. In addition to the equitable relief sought in their original complaint, the Wien parties seek monetary damages relating to the alleged refusal of Grzimek to sell GAC to Wien. *See Complaint in Equity to Impose Equitable Lien and/or Constructive Trust, and to Require Special Accounting and Complaint to Recover for Consulting Services* and *Plaintiffs' Second Amendment*. The Georgia lawsuit, like the present case and the New York lawsuit, includes factual allegations of misdealings by the

---

[3] The GAC parties assert that they, in fact, are the proper owners of these Polish aircraft, and have submitted evidence to support this position. Wien have also submitted evidence to the contrary and indicating that FSB is the true record owner of the Polish aircraft. For reasons discussed *infra*, the court will leave the resolution of this issue for the court in Georgia.

7

GAC parties and Grzimek, including the alleged refusal to sell the GAC stock to Wien and the failure by GAC to lease the three Boeing 737 aircraft to Wien. In the Georgia lawsuit, the Wien parties allege, *inter alia*:

> Ultimately, this led to an agreement under which Mr. Tjontveit was to purchase all of Mr. Grzimek's outstanding stock in a German corporation known as GAC Trans-Air Carrier Leasing GmbH FlugzeugLeasing (hereinafter "GAC"), a corporation completely owned by Mr. Grzimek and originally formed to purchase airport real property and aircraft which had been formerly owned by the East German government. In addition, Mr. Tjontveit agreed (on behalf of Wien) that Wien would sell to GAC three of the 737 aircraft that Wien had the contractual rights to purchase from third-parties. Finally, it was agreed and understood that the three aircraft would be leased back to Wien by GAC so that Wien could use the planes in its business strategy for expansion in what had formerly been East Germany. In essence, this series of transactions would provide Mr. Tjontveit (and, indirectly, Wien) a mechanism to finance portions of costs required to purchase and repair the three 737 aircraft (using funds already available to GAC) while simultaneously insuring that Wien would have possession and use of the aircraft to further its European expansion plans. Moreover, it would enhance Wien's business plans through the control and use of assets owned by and business opportunities available to GAC.

*Second Amendment* ¶ 71.

Initially, the court observes that the driving force behind the Georgia litigation appears to be the Wien parties' allegation that Mr. Brandt, the former attorney for Wien, acted tortiously in connection with Wien's planned acquisition of an interest in FSB and appropriated ownership to himself instead of facilitating a sale of the ownership in FSB to Wien Air Alaska. Although the complaint in the Georgia action does, as the GAC parties assert, contain factual allegations as to the three Boeing 737 aircraft that were the subject of the May 4, 1992, settlement agreement and court judgment entered January 29, 1993, the court cannot agree that these background references are a bar to the *in rem* action

8

asserted over the Polish aircraft located in Georgia on the claims against FSB and Mr. Brandt. The fact that the Georgia court may be required to determine the ultimate ownership issues as they relate to the Polish-manufactured aircraft is of no moment to the motion before the court here, for the *res* at issue in the May 14, 1992, order and the subsequent court judgment were the three Boeing 737s; namely, the "Busy Bee," "Express One," and "Aloha" aircraft, respectively.

The settlement agreement of May 14, 1992, stated that

> . . . all claims and controversies *existing as of the date hereof* between the GAC Parties, on the one hand, and the Wien Parties, on the other hand, are hereby settled *and may not be relitigated* between them in any forum whatsoever; and no one or more of the Wien Parties, on the one hand, and no one or more of the GAC Parties, on the other hand, shall commence or prosecute any action or proceeding, judicial, quasi-judicial or otherwise, against the other, *regarding such claims or controversies.*

*Settlement Agreement* ¶ 3.b (emphasis added). It seems clear to the court, based upon this language, that the settlement agreement encompassed only those claims and controversies that existed in this, the original Alabama action (the "Pemco" lawsuit). The record does not contain any claim by the Wien parties against the GAC parties, or vice versa, with regard to property rights in the Polish-made aircraft, which is the subject of the Georgia *in rem* litigation.[4] Moreover, the Pemco proceedings never involved claims against Mr. Brandt or against FSB, which, apparently, is at the heart of the Georgia litigation. That the GAC parties may have at least an arguable stake in the Polish aircraft,

---

[4] Moreover, there is a strong possibility, based upon the record, that GAC's ownership rights in the Polish-made aircraft arose *after* the 1992 settlement agreement was adopted by this court.

the subject of the Wien parties' claims against Mr. Brandt and FSB, would not necessarily mean that their interest could not be the subject of the Georgia litigation because of the settlement in this action. In other words, it does not necessarily follow that because some of the background facts that were relevant in the original Pemco action are material to the claims asserted in the Georgia action against GAC and other parties that the settlement agreement and court order preclude the claims with regard to the Polish manufactured aircraft.

Finally, it must be pointed out that, despite the squabbling by the parties, the court took extra steps to clarify for the parties the limited nature of its judgment at the January 28, 1993, hearing as follows:

> I am going to enjoin all of you from bringing any additional – first of all, from violating the terms of the settlement that was entered in May of last year and the order of this Court adopting and incorporating the terms of the settlement agreement; and second from bringing any further actions based upon the relationship between [the] GAC [parties] and the Wien parties regarding the transactions – *anything arising out of the transactions between the parties regarding the Busy Bee, the Express One, and the Lufthansa airplanes. Those are the airplanes that were involved in this settlement. And whatever else you've got going, God bless you.*

*Transcript of January 28, 1993, proceeding* at 336-37 (emphasis added). With that final statement, it was certainly clear to the court -- and should have been to the parties – that the settlement agreement and injunction covered only those claims arising from the facts plead and litigated in this original action.

Though not relevant to the conclusions drawn here, the court notes that the Georgia lawsuit, as it relates to the GAC parties, deals only with their possible ownership in the Polish-made aircraft and their respective position in the priority chain as an owner or a

10

holder of a security interest therein. Indeed, the parties dispute whether such alleged ownership rights arose before or after the May 1992 settlement agreement and subsequent judgment order were entered. The court, however, has been advised by both parties that the *in personam*, direct claims against the GAC parties have been dismissed in the Georgia action. However, to the extent any remaining *in personam* claims exist in the Georgia lawsuit against the GAC parties which are founded upon the relationship between the GAC parties and the Wien parties regarding the transactions pertaining to the Busy Bee, the Express One, and the Lufthansa airplanes and the oral agreement for the sale of GAC stock, the Wien parties will be directed to dismiss such claims with prejudice. And, to clarify, any remaining claims asserted against any of the GAC parties for the alleged breach of contract concerning the sale or transfer of GAC stock to Wien must be dismissed with prejudice in the Georgia litigation.[5]

### C.   Award of Costs and Attorneys' Fees.

The GAC parties move the court to award them their reasonable attorneys' fees and costs incurred in prosecuting this motion. *See GAC Parties' Supplement to Motion to Show Cause and Supporting Brief* at 6-9. Without question, because of the Wien parties' disregard of this court's order and its responsibilities under the settlement agreement, the GAC parties were forced to expend significant resources in examining the New York and Georgia lawsuits, comparing such lawsuits to the Alabama action, researching relevant law

---

[5] The court does not imply that those matters may not form appropriate foundational or background evidence in regard to the claims in the Georgia litigation. That is a matter for that court to determine.

on whether the New York and Georgia lawsuits should be dismissed, preparing the motion to show cause, and in attending the hearing on the motion.

In *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 111 S. Ct. 2123, 2132-33, 115 L. Ed. 2d 27 (1991), the Supreme Court held that federal courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." This power includes the ability to assess attorney fees where appropriate. *See id.* at 45, 111 S. Ct. at 2133. In affirming extensive attorneys' fees as sanctions, the *Chambers* Court held that

> a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . . In this regard, if a court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or *by hampering enforcement of a court order.* . . . The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself.

*Id.* at 45-46, 111 S. Ct. at 2133 (citations and quotation marks omitted) (emphasis added). By filing their claims against the GAC parties in the New York and Georgia fora, Wien disobeyed and hampered the enforcement of this court's order.

Most disturbing to the court, however, is the sworn statement of one of the Wien parties, Thor K. Tjontveit. In an affidavit filed with the court on September 9, 1997, Mr. Tjontveit states that, prior to authorizing the filing of the New York and Georgia lawsuits, he personally examined the court's transcript and order in which the court permanently enjoined the Wien parties from further litigation against the GAC parties concerning the three Boeing 737 aircraft and the alleged oral contract. *See Tjontveit Affidavit* at 1-2 (non-

12

paginated). "Based upon [his] interpretation of the transcript and the order, [he] felt confident that [he] could proceed with the lawsuits." *Id.* at 1. In both the New York and Georgia lawsuits, pursuant to Tjontveit's direction, claims were asserted against the GAC parties concerning the alleged oral contract between Tjontveit and Grzimek, and regarding the three Boeing 737 aircraft. The only reasonable conclusion that can be reached from Mr. Tjontveit's representations is that he acted in bad faith and for vexatious reasons and in direct violation of this court's injunction.

Despite numerous communications by the GAC parties' attorneys to counsel for the Wien parties requesting the dismissal of the claims subject to this court's permanent injunction, the record shows that the Wien parties unnecessarily delayed in dismissing these claims. First, the Wien parties' New York counsel declined to even respond to the July 9, 1997, letter requesting dismissal of the New York lawsuit. Only after the GAC parties filed the motion in this court to show cause and the court set it for hearing did the Wien parties dismiss the GAC parties from the New York lawsuit. Even then, the dismissal was without prejudice. Second, the Wien parties dismissed the *in personam* claims against the GAC parties in the Georgia lawsuit only three days prior to the September 12, 1997, hearing, notwithstanding the GAC parties' longstanding requests for the dismissal.

The GAC parties have submitted the affidavits of their counsel, Bradley C. Weber, a Texas attorney handling various GAC matters, and E. Glenn Waldrop, Jr., an Alabama attorney who also represented the GAC parties in this action several years ago and has represented them now, in support of their request for an award of reasonable costs and

13

attorneys' fees. Subsequently, the GAC parties submitted the affidavits of Hubertus Kestler, German counsel for the GAC parties, and Stephan Grzimek, one of the GAC parties.

The various claims for attorneys' fees and costs break down as follows: Mr. Weber testifies that the fees attributable to himself, his associate Tom Yoxall, a law clerk, and a legal assistant totaled $21,600.00, and that his firm has incurred costs associated with this show cause motion in the amount of $2,120.71. *See Weber Affidavit* ¶¶ 9-12. Mr. Waldrop testifies that his firm has incurred legal fees of $4,312.50 and costs of $502.85. *See Waldrop Affidavit* ¶ 12. Mr. Kestler testifies in his affidavit that he and his firm have incurred $11,112.00 in fees for the legal services performed in connection with the claims alleged against the GAC parties and Grzimek in the New York and Georgia lawsuits, and the motion to show cause filed in the Alabama lawsuit. *See Kestler Affidavit* ¶ 13. Finally, Mr. Grzimek states that the reasonable travel expenses and lodging costs incurred by him and Mr. Kestler in traveling to New York totaled $7,440.00. *See Grzimek Affidavit* ¶ 10. Additionally, Mr. Grzimek claims that the expenses incurred by the two of them to travel to Birmingham, Alabama, to attend the show cause hearing totaled $5,614.00. *See id.* The grand total of all these claims for fees and costs with respect to the activity culminating in the show cause motion equals $ 52,702.06.

While the court finds an award of fees and costs is proper in this matter, the court is not inclined to grant an award for the recovery of all these purported fees and expenses. It is undisputed that much of the work performed by Mr. Weber and his firm reached beyond the scope of the show cause motion. While Mr. Weber and his associate, Mr. Yoxall, defend their necessity in preparing for the show cause hearing on September 12,

14

1997, and for traveling from Texas to Birmingham to attend the hearing, the court is not persuaded that it was at all necessary or reasonable for these lawyers to personally attend the hearing in Birmingham. In fact, these lawyers were admitted *pro hac vice* only three days prior to the show cause hearing. Mr. Waldrop, local counsel in Alabama, represented the GAC parties in the original proceedings and in regard to this motion. He was sufficiently conversant with the facts and applicable law that he required no additional assistance from out-of-town counsel.

Based on the foregoing, the court will award reasonable fees and expenses incurred by Mr. Waldrop in connection with his representation of the GAC parties on the motion to show cause and for sanctions in the amount of $4,815.35. Moreover, the court deems it reasonable that Mr. Grzimek should have been present for the hearing. His expenses in the amount of $7,500.00 will be awarded.[6]

### IV.   Conclusion.

Accordingly, the GAC parties' motion to show cause will be granted in part and denied in part. The court will enter an appropriate order in conformity with this memorandum of opinion.

---

[6] This amount is based upon the original claim made by Mr. Grzimek and Mr. Kestler for $21,600.00 for their expenses and costs in travelling to New York and, then, to Birmingham for the show cause hearing. *See Grzimek Affidavit* ¶ 10. Because the court is of the opinion that the attendance by Mr. Kestler at the show cause hearing was neither necessary nor reasonable and that the New York complaint could have been reviewed without the necessity of travelling from Germany to New York, the court has reduced the total fees and costs claims to $7,500.00.

Done, this \_\_\_17th\_\_\_ of November, 1997.

*[signature]*

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE